Approved: _____
          Lindsey Keenan
          Assistant United States Attorney

Before:   THE HONORABLE JUDITH C. McCARTHY
          United States Magistrate Judge
          Southern District of New York

------------------------------------X
UNITED STATES OF AMERICA    :  SEALED COMPLAINT

                - v. -    :  Violations of 18 U.S.C.
                             :  §§ 1951, 924(c)(1), and
                             :  2

RAHMEL NASH and               :
FRANK DELORENZO,             :  COUNTY OF OFFENSE:
                             :  ROCKLAND
             Defendants.     :
                             :
------------------------------------X

SOUTHERN DISTRICT OF NEW YORK, ss.:

       JUSTIN M. GRAY, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

### COUNT ONE
(Conspiracy to Commit Hobbs Act Robbery)

       1.   On or about December 5, 2019, in the Southern District of New York and elsewhere, RAHMEL NASH and FRANK DELORENZO, the defendants, and others known and unknown, unlawfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), and would and did thereby obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, NASH and DELORENZO conspired to rob a marijuana dealer ("Victim-1") of marijuana, and the cash proceeds of marijuana sales in Garnerville, New York.

       (Title 18, United States Code, Section 1951.)

**COUNT TWO**
(Attempted Hobbs Act Robbery)

2.      On or about December 5, 2019, in the Southern District of New York and elsewhere, RAHMEL NASH and FRANK DELORENZO, the defendants, and others known and unknown, knowingly did attempt to commit robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), and would and did thereby obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, NASH and DELORENZO attempted to rob Victim-1, a marijuana dealer, of marijuana and the cash proceeds of marijuana sales in Garnerville, New York.

(Title 18, United States Code, Sections 1951 and 2.)

**COUNT THREE**
(Use of a Firearm)

3.      On or about December 5, 2019, in the Southern District of New York and elsewhere, RAHMEL NASH and FRANK DELORENZO, the defendants, and others known and unknown, during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, namely, the attempted robbery charged in Count Two of this Complaint, knowingly did use and carry a firearm, and, in furtherance of such crime, did possess a firearm, which was discharged during the robbery of Victim-1, and aided and abetted the same.

(Title 18, United States Code, Sections 924(c)(1)(A)(i), (iii), and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

4.      I am a Special Agent with the FBI.  This affidavit is based on my personal participation in the investigation of this matter, my conversations with other law enforcement agents, witnesses and others, and my review of video recordings, as well as my examination of reports and records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein,

2

they are reported in substance and in part, except where otherwise indicated.

      5.    Based on my review of reports from the Haverstraw Police Department (the "HPD"), I have learned the following:

      a.    On or about December 5, 2019, the HPD responded to a report of a shooting at an address on Norris Street, in Garnerville, New York (the "Norris Street Address"). While processing the crime scene at the Norris Street Address, the HPD recovered a ski mask, dog-repellant pepper spray, blood-stained clothing, and two .32 caliber shell casings, among other things.

      b.    On or about December 5, 2019, the HPD interviewed a resident of the Norris Street Address ("Victim-1"), who stated, in substance and in part, that when he returned home to the Norris Street Address on or about December 5, 2019, at approximately 1:30 p.m., two individuals in masks pushed their way into the side door of his garage as he was walking to his truck. According to Victim-1, he called for assistance and his father ("Victim-2") grabbed one of the masked intruders. Victim-1 stated that during the struggle with the masked intruders, he heard two gunshots, and the intruders ran away. According to Victim-1, after the intruders left he tried to stand up but was unable to do so.

      c.    On or about December 5, 2019, the HPD interviewed Victim-2, who stated, in substance and in part, that he also resides at the Norris Street Address. According to Victim-2, he heard Victim-1 yelling in the garage. Victim-2 stated that he entered the garage, and saw Victim-1 struggling with two masked intruders. According to Victim-2, the masked intruders were attempting to enter the garage through the side door, and were spraying pepper spray through the door. Victim-2 stated that he grabbed one of the intruders, placed him in a chokehold, and pulled off his mask. According to Victim-2, during the struggle he heard two gunshots, and when he looked down he saw one of the intruders holding a shiny, silver semi-automatic style handgun. Victim-2 said that he pushed the intruder away, and both intruders ran out of the garage. Victim-2 stated that after the intruders left, he discovered that Victim-1 was shot in the buttocks, and had injuries to both legs.

      6.    On or about December 5, 2019, a detective from the HPD (the "Detective") and another Special Agent from the FBI

interviewed a third individual ("Victim-3").  In addition, on or about May 12, 2020, I interviewed Victim-3.  Based on my review of a video recording of the December 5, 2019, interview, and my participation in the May 12, 2020, interview of Victim-3, I have learned the following:

      a.   According to Victim-3, Victim-1 is a marijuana dealer and is known to prepare marijuana for sale, and to sell marijuana, in the garage at the Norris Street Address.

      b.   According to Victim-3, Victim-1 called her on or about December 5, 2019, and stated, in substance and in part, that someone tried to rob him, he was shot, and he needed to go to the hospital.  Victim-3 stated that after receiving Victim-1's call, Victim-3 went to the Norris Street Address to take Victim-1 to the hospital.  Victim-3 stated that when she arrived at the Norris Street Address, she went to the garage where she saw two large jars which contained marijuana.  Victim-3 stated that she moved the marijuana to her car before driving Victim-1 to the hospital in Victim-1's car.

      c.   Victim-3 stated, in substance and in part, that while she was at the hospital with Victim-1, she asked a friend to drive her car from the Norris Street Address to Victim-3's residence in Tomkins Cove, New York (the "Tomkins Cove Address").  According to Victim-3, later in the evening on or about December 5, 2019, after her car had been transported to her residence, someone broke into her car and took the marijuana.

    7.   Based on my review of a report from the Stony Point Police Department (the "SPPD"), I have learned the following:

      a.   On or about December 5, 2019, at approximately 5:20 p.m., the SPPD responded to a possible burglary at the Tomkins Cove Address.

      b.   Upon arrival, the responding officers saw Victim-3's car in the driveway, and observed that the front driver's window was broken.

      c.   According to the responding officers, Victim-3's car smelled strongly of marijuana, and a container in the back of the car held a small quantity of a leafy green substance consistent in appearance with marijuana.

        d.  According to the responding officers, they interviewed a witness at the Tomkins Cove Address ("Witness-1"). Witness-1 stated, in substance and in part, that when she left the Tomkins Cove Address at approximately 2:30 p.m., Victim-3's car was not there, but when she returned at approximately 5:20 p.m., the car was at the Tomkins Cove Address and the car was damaged.

    8.  On or about December 5, 2019, Victim-3 consented to a search of her cellphone. Based upon my review of Victim-3's text messages, I have learned the following:

        a.  On or about August 14, 2019, Victim-1 sent Victim-3 a series of text messages. In the messages, Victim-1 asked Victim-3 to let another individual in through the "side door" and move the "bud" in the "big bag" to his room, because Victim-1 did not want the "bud" out in his absence.

        b.  On or about September 13, 2019, Victim-3 received a text message from an individual requesting to purchase "an eighth." Victim-3 directed the individual to Victim-1's Norris Street Address, and instructed the individual to use the side door by the garage. Victim-3 then asked the individual to pay Victim-1 through a peer to peer payments application.

    9.  Based on my training and experience, I am aware that "an eighth" is a quantity of marijuana, and that "bud" is common street slang for marijuana.

    10.  Based upon the foregoing, as well as Victim-3's statements described in Paragraph 6 above, and the police report regarding the burglary of Victim-3's car, I believe Victim-1 sells marijuana and that the attempted robbery described in Paragraphs 5 above was executed for the purpose of stealing Victim-1's marijuana, and the proceeds of Victim-1's marijuana trafficking.

    11.  Based on my review of surveillance video recovered from the Norris Street Address and neighboring residences, I have learned the following:

        a.  On or about December 5, 2019, at approximately 12:17 p.m., a black Toyota Solara (the "Solara") drives by the Norris Street Address.

        b.   On or about December 5, 2019, at approximately 12:22 p.m., two men dressed in black, wearing hoods, and carrying a large bag, exit the Solara, and approach the Norris Street Address.  As the men approach the Norris Street Address, a Puma-brand logo on one of their shirts is visible.  After the two men get out of the car, the Solara turns around, and parks across the street from the Norris Street Address.

        c.   At approximately 1:04 p.m., Victim-1 drives up to the Norris Street Address in his truck, a Ford F150.

        d.   At approximately 1:18 p.m., a struggle is audible, followed by two gunshots, then two individuals dressed in black and wearing hoods run away from the Norris Street Address.

        e.   At approximately 1:19 p.m., the Solara drives eastbound, and a license plate, consistent in color with a New Jersey plate, is visible.

    12.   On or about December 6, 2019, I spoke with a police officer from the SPPD.  According to the police officer, on or about December 5, 2019, at approximately 3:30 p.m., a Toyota Solara bearing a New Jersey registration ending in LYH was traveling north when it hit a Stony Point mobile license plate reader.

    13.   Based on my review of mobile license plate reader data, I have learned that on the afternoon of December 5, 2019, only one Toyota Solara with a New Jersey registration hit mobile license plate readers in Rockland County, New York.  Thus, I believe the Solara described in Paragraph 12 above was the car used in the robbery described in Paragraph 5 above.

    14.   I have reviewed surveillance video from a motel in Stony Point, New York (the "Motel"), which is approximately five minutes away from the Norris Street Address.  Based on my review of the surveillance, I have learned that the Solara described in Paragraph 12 above was parked at the Motel on or about December 5, 2019, at approximately 11:00 a.m., and again at approximately 4:00 p.m.

    15.   On or about December 13, 2019, I interviewed detectives from the SPPD.  Based on my conversation with the detectives, I have learned the following:

        a.    The detectives are familiar with RAHMEL NASH, the defendant, from prior law enforcement encounters, including traffic stops and previous arrests.

        b.    The detectives reviewed surveillance video from the Motel dated December 5, 2019.

        c.    According to the detectives, NASH is identifiable in the surveillance video from the Motel's registration desk on or about December 5, 2019, at approximately 11:00 a.m.

        d.    The detectives also reviewed the surveillance video described in Paragraph 11 above, taken from the Norris Street Address and neighboring residences on or about December 5, 2019. The detectives compared their observation of NASH in the surveillance video from the Motel with the appearance of the individuals in the surveillance video from the Norris Street Address, and are confident that while in the Motel on or about December 5, 2019, NASH was wearing the same clothing, including a shirt with a Puma-brand logo, as one of the individuals depicted in the surveillance video from the Norris Street Address.

        16.    I have compared my observation of the surveillance video described in Paragraph 11 above, taken from the Norris Street Address and neighboring residences on or about December 5, 2019, with the surveillance video from the Motel, described in Paragraph 15 above. I am confident that the individual depicted in the surveillance video from the Norris Street Address is the same person as the individual depicted in the surveillance video from the Motel, based upon the individual's clothing, height, weight, and body type.

        17.    Based upon my conversations with a detective from the Yonkers Police Department ("YPD"), and my review of a computer aided dispatch report from the YPD, I have learned that on or about December 18, 2019, at approximately 4:00 p.m., the YPD conducted a traffic stop of the Toyota Solara described in Paragraph 12 above. At the time of traffic stop, FRANK DELORENZO, the defendant, was driving the Solara and provided his New York State driver's license as identification.

        18.    I have reviewed a report from the New York State Police Forensic Investigation Unit, and spoken with a forensic examiner at the New York State Police Forensic Investigation Unit, and I have learned the following:

        a.    The DNA profile from the dog repellant pepper spray can recovered by the HPD from the garage at the Norris Street Address on or about December 5, 2019, is an identical match to the DNA profile of RAHMEL NASH, the defendant, as previously indexed by the New York State Police Local DNA Index System.

        b.    The DNA profile from the ski mask recovered by the HPD from the garage at the Norris Street Address on or about December 5, 2019, is an identical match to the DNA profile of FRANK DELORENZO, the defendant, as previously indexed by the New York State DNA Index System.

    WHEREFORE, deponent prays that a warrant be issued for the arrest of RAHMEL NASH, and FRANK DELORENZO, the defendants, and that they be arrested and imprisoned, or bailed, as the case may be.

        /s/ Justin M. Gray, Credential #27701
        Justin M. Gray
        Special Agent
        Federal Bureau of Investigation

Sworn to before me through the transmission of this Complaint by reliable electronic means, pursuant to Federal Rule of Criminal Procedure 4.1 this

**(By Facetime)**

20th day of May, 2020

_/s/ Judith C. McCarthy_
THE HONORABLE JUDITH C. McCARTHY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK